## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **CRIMINAL ACTION** |
| | ) | **No. 06-20162-01-KHV** |
| v. | ) | |
| | ) | **CIVIL ACTION** |
| KEVIN TOMMIE HALL, | ) | **No. 12-2097-KHV** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### MEMORANDUM AND ORDER

On October 7, 2008, a jury found defendant guilty of armed bank robbery; using, carrying or brandishing a firearm during and in relation to a crime of violence; and possession of a firearm by a convicted felon. See Verdict (Doc. #104). On June 10, 2009, the Court sentenced defendant to 594 months in prison. See Judgment In A Criminal Case (Doc. #144). This matter is before the Court on defendant's Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody (Doc. #184) filed February 16, 2012. For reasons stated below, the Court overrules defendant's motion.[1]

---

[1]     The government asserts that defendant's motion is untimely because defendant filed it one day after the statutory deadline. Section 2255 provides a one-year period of limitation which ordinarily runs from the date on which the judgment of conviction becomes final. When a defendant has filed an appeal, a judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's ruling. Clay v. United States, 537 U.S. 522, 524-25 (2003). Here, the Tenth Circuit issued its mandate on December 8, 2010. The deadline to file a petition for certiorari expired on or about February 15, 2011, i.e. 69 days after the appellate court issued its mandate. See id. Therefore defendant had until February 15, 2012 to file a motion to vacate under Section 2255. According to defendant's declaration, he deposited the Section 2255 motion in prison mail on February 10, 2012. See Motion Under 28 U.S.C. § 2255 (Doc. #184) at 83. Under the prison mailbox rule, the Court deems defendant's motion filed on the day he delivered it to prison officials for mailing. See Price v. Philpot, 420 F.3d 1158, 1165 (10th Cir. 2005); United States v. Gray, 182 F.3d 762, 764, 765 n.4 (10th Cir. 1999) (extending prison mailbox rule to Section 2255 motions). The government has not responded to defendant's argument under
(continued...)

## **Factual Background**

On direct appeal, the Tenth Circuit summarized the trial testimony as follows:

At 1:36 p.m. on November 7, 2006, a masked man carrying a pistol-grip shotgun robbed the MidAmerican Bank and Trust in Leavenworth, Kansas. The robber had entered through a rear door, hurried to the teller station, and demanded money from teller Debbie Smith. Smith gave him money from several different drawers, including marked bills with prerecorded serial numbers. The robber put the money in a white plastic bag and left through the rear door. He walked briskly to a nearby parking lot, got in a car, and drove away.

Mary Garrison, who worked in a neighboring office building, was walking to her car to get a bottle of water when she noticed a white male sitting alone in the passenger seat of a four-door bluish gray car. She then saw a taller white male wearing dark clothing run to the car, get into the driver seat, and speed away. When the police arrived a "a minute or two" later, she described the car and told them the direction in which it had driven off. Trial Tr., Doc. 150 at 125.

At 1:41 p.m. the Lansing, Kansas, Police Department sent out an alert notifying officers of the bank robbery and describing the suspect vehicle as "a four-door blue vehicle occupied by two white males." *Id.* at 136. At 1:56 p.m., 20 minutes after the robbery, Manuel Olmos, a Lansing police officer, was driving in his marked patrol car when he saw a blue sedan with two white males coming toward him. He made eye contact with its occupants, and his eyes and theirs "just fixated on each other and . . . we just kept looking at each other . . . as we passed each other." *Id.* at 141. The officer turned his car around and began to follow the vehicle.

A chase ensued, with speeds exceeding 100 miles per hour. The blue sedan ran stop signs, sped through intersections, drove in emergency lanes to get around other vehicles, and passed a funeral procession at a high rate of speed.

Eventually, the blue sedan came to a stop in a parking lot in Kansas City, Kansas, after officers placed "stop sticks" in the road to deflate the car's tires. *Id.* at 191.

The vehicle's occupants were arrested at gunpoint. Mr. Hall was the driver and James Morrison was the passenger. The blue sedan was registered to Mr. Hall. Mr. Hall was clothed almost entirely in Harley-Davidson apparel; he was wearing

---

[1](...continued)
the prison mailbox rule. Accordingly, the Court finds that his motion is timely.

a Harley-Davidson shirt, a pair of Harley-Davidson jeans, and black Harley-Davidson zip-up boots with a lace on top. He was also wearing a black belt with a large Harley-Davidson silver buckle on which a gold-colored eagle was depicted.

Several items related to the robbery were recovered along a rural gravel road on the route of the chase. One of the pursuing officers had noticed dark clothing lying by the side of the road and radioed its location. Another officer searched the area and found a black hooded sweatshirt and a pair of brown gloves.

Farther up the road, members of a Westar Energy crew installing overhead power lines had seen police cars pursuing a blue sedan. As the sedan raced by, the crew foreman observed that the passenger "looked like he was changing his shirt or something he was, kind of humped in the seat, his arms were like somebody was taking off a shirt or putting one on." *Id.* at 215. A crew member working in an aerial bucket when the sedan passed saw a black object fly out of the passenger-side window. Police searched the area and recovered a ski mask.

A forensic scientist was able to obtain a DNA profile from the mask that was consistent with Mr. Hall's DNA. Only 1 in 35,160 people would have a matching profile.

Another officer searching along the gravel road found a white plastic bag containing $14,440, including the marked bills from the bank. (A later audit of the teller's drawer showed that $14,541 had been taken.) On the bag was the Harley-Davidson logo and the address of a Harley-Davidson store in Blue Springs, Missouri. The day after the robbery, police officers discovered a dark, pump-action shotgun with a pistol grip in a roadside ditch by the gravel road.

After arresting Mr. Hall, officers searched his car and found in the back seat a receipt from a Wal-Mart in Lee's Summit, Missouri. The receipt showed that at 11:14 p.m. on November 6, 2006, the night before the robbery, someone had purchased a three-hole mask, cigarettes, and a pair of gloves. Surveillance footage from the store showed Morrison and Mr. Hall arriving at the Wal-Mart in the blue sedan at 10:50 p.m., both men entering and exiting the store, and Morrison purchasing the items listed on the receipt. Morrison was wearing a distinctive black-and-orange jacket, which police officers found in the back seat of Mr. Hall's car.

Officers also obtained surveillance tapes from the bank. One showed that Morrison had conducted a transaction at Smith's teller station only six minutes before the robbery. Morrison was wearing a Harley-Davidson hat.

\* \* \*

-3-

To rebut the case against him, Mr. Hall presented an alibi defense. The predicate of the defense was that he was not positively identified by any witnesses at the robbery scene. We therefore summarize the eyewitness descriptions and other identification evidence before reciting his account of his whereabouts.

Mr. Hall is white and 6' 2" tall. At the time of his arrest he was 46 years old, weighed about 210 pounds, had a shaved head, and wore a mustache. Although most of the eyewitnesses were consistent in their descriptions of the robber as relatively slender, approximately six feet tall, and wearing dark clothing and a dark ski mask, and teller Smith said that he was wearing "a black belt with a silver buckle," *id.* at 79, there were some inconsistencies in the eyewitnesses' physical descriptions of the robber and not all descriptions matched Mr. Hall's true appearance.

One eyewitness described Mr. Hall as 5' 10" (but admitted that was just a guess), and another who admitted to seeing the robber for "[m]aybe about ten seconds," id. at 96, estimated that he was between 5' 7" and 5' 10" tall. One witness estimated that the robber weighed 165 pounds, while another described him as weighing between 175 and 200 pounds. At least two witnesses described the robber as young, though one based her opinion on the sound of his voice, and the other assumed that the robber was in his 20s "because he was so thin." *Id.* at 116. Three witnesses described the robber as having hair, but one admitted that what she thought was hair could have been a hat, another (who reported seeing hair coming out the back of the mask) testified that she saw the robber only for a matter of seconds before she got under her desk, and the third stated that because she "didn't see any long hair . . . coming out of the ski mask," she assumed that he had short hair. Trial Tr., Doc. 151 at 485. Also, neither of the witnesses who saw the robber after he had left the bank and rolled up the ski mask mentioned seeing a mustache. One witness indicated on a police form that the robber wore tennis shoes, although it was pointed out at trial that the tennis shoe was the only option on the form depicting a lace-up shoe above the ankle. Finally, two witnesses observed that the robber had a tan or dark complexion.

In addition, some of the forensic evidence did not implicate Mr. Hall. The government's expert identified two "possible" hairs inside the recovered ski mask, but did not conduct DNA tests on either of them. *Id.* at 403. She did find some DNA on the recovered shotgun, but both Mr. Hall and Morrison were eliminated as being its source. Further, the police were unable to find any fingerprints on the shotgun, and the recovered money was not examined for fingerprints.

Mr. Hall filed a notice of alibi defense one week before trial. It said that he would be the sole alibi witness and that at the time of the robbery he was "near a halfway house for recently released prisoners" in Leavenworth, Kansas. Suppl. R., Vol. 1 at 48. Given that he was seen driving the getaway car 20 minutes after the robbery, he needed to explain how he happened to enter the car in the interim.

His explanation was that the robber was a man named Lee, who (with Mr. Hall's permission) had driven off with Morrison about 45 minutes before the robbery and returned the car to Mr. Hall a few minutes after the robbery.  [Hall] testified as follows:

> In 1992 Mr. Hall pleaded guilty to a bank robbery committed in 1990.  He remained incarcerated until he was released to a halfway house in Leavenworth, Kansas, in August 2005.  A few days later he got a job as a welder, making from $600 to $700 per week.  After three months in the halfway house, although still on supervised release, he moved to Topeka, Kansas, and lived with his mother before moving in with a girlfriend, Sherry Lorence.  He bought a Harley-Davidson and a car.  Mr. Hall incurred two DUI charges during the first half of 2006.  As a result, his probation officer required him to wear an electronic monitoring bracelet and imposed an evening curfew.  He lost his job in late September 2006 and borrowed money from his mother.

> In early November 2006 Mr. Hall had a fight with Lorence.  He went to Kansas City, Kansas, where he stayed in motels and with his sister, Connie Lunsford.  He was aware that being in Kansas City was a violation of his supervised release, but he assumed that he would be heading back to prison anyway because of the pending DUI charges, so he "just left." Trial Tr., Doc. 148 (Hall Testimony) at 12.

> While in Kansas City, Mr. Hall hung out in bars.  It was in one such bar, on Saturday, November 4, three days before the robbery, that he met Morrison.  The two men met again on November 6.  During their night of drinking, they met Lee, who was shorter than Mr. Hall, but taller than Morrison, was "half white, half Mexican," weighed between 165 and 170 pounds, had medium-length brown hair, and was in his late 20s. *Id.* at 27.  Mr. Hall had never met Lee before.

> Mr. Hall drove Morrison and Lee to a hotel.  After Lee and Morrison carried Morrison's belongings to a room, Morrison returned to the car and asked Mr. Hall to drive him to the store for cigarettes.  On the way Mr. Hall noticed that the license-plate light on his car was not working, so he decided to drive to a nearby Wal-Mart to fix it.  In addition to cigarettes, he purchased a screwdriver and a hooded sweatshirt for Morrison.  Morrison asked for the sweatshirt because the jacket he was wearing belonged to Lee and he needed something to keep warm since "he didn't have a place to stay." *Id.* at 29.  For the

same reason, Morrison separately purchased gloves and a ski mask. Mr. Hall then took Morrison back to the hotel, where Morrison got $18 from Lee to repay Mr. Hall.

Mr. Hall then drove to his sister's house to spend the night. Mr. Hall drove back to the hotel the following morning and picked up Morrison and Lee. Morrison needed a truck to get some of his belongings from his former residence, so Mr. Hall volunteered to give him a ride to Lansing, Kansas, where Lee knew someone who would lend them one. En route, they stopped at the hospital where Mr. Hall's sister Connie worked, and she gave him $20. Mr. Hall then drove to a liquor store and purchased a pint of Wild Turkey.

Lee, however, was unable to borrow a truck in Lansing, so they drove to Mr. Hall's former halfway house in Leavenworth. Wanda Wing, Mr. Hall's former girlfriend, was staying there. He wanted to speak to her and thought she might be willing to lend them a truck. Upon their arrival, he asked a woman who was sitting outside to ask Wing to come out and speak with him. While the three men waited for Wing, a staff person came outside. Mr. Hall turned away, knowing that he was not supposed to be associating with residents of the halfway house. Morrison thought that the staff person was staring at Mr. Hall's car, so Mr. Hall suggested that Morrison and Lee take the car elsewhere while he waited across the street for Wing to come out and talk. Morrison and Lee left between 12:30 and 1:00 p.m. Wing never came out to speak with Mr. Hall, though he saw her through a window.

Morrison returned with the car, but not Lee, about an hour later. He said that they were to meet Lee at the Dillons store, so Mr. Hall got in the driver's seat and began driving there. While stopped at a red light, he saw Lee a few cars ahead of them driving a pickup truck, and he tried to follow him.

A few moments later a police car passed Mr. Hall, who noticed that the officer was looking at him "like he saw something, saw a ghost or whatever, that's how hard he looked at me." *Id.* at 37. Thinking that there might be a warrant out for his arrest because he had violated the terms of his supervised release, he "tried to get away." *Id.* at 38. By the time he caught up to Lee's truck and pulled along side it, Morrison was "act[ing] like something was really wrong." *Id.* at 39. Morrison "kept looking back and he kept telling me, hurry, go, go, go, and that's what I was doing." *Id.* Mr. Hall first asked what was going on when Morrison pulled out a three-quarter

inch stack of five dollar bills and put it in a tote bag, but Morrison just told him to drive. Without asking any other questions, he complied. As they passed Lee's truck, Morrison threw the tote bag in the bed of the pickup. Just after that Mr. Hall encountered a police vehicle, which gave chase.

Mr. Hall did not know why he initially was running from the police, but he was scared. He "started figuring out that something was really wrong" when Morrison "started throwing stuff out" and continued imploring Mr. Hall to "go, go, go." *Id.* at 42. At one point, without saying a word, Morrison reached into the backseat, pulled out a shotgun from underneath Lee's jacket, and brought it toward the window. Not knowing what Morrison was going to do, Mr. Hall grabbed his elbow and the gun discharged. Morrison then threw the gun out the window. He also threw out the window a white, plastic bag that was tied shut. It was only then that Morrison told him that "Lee might have robbed something." *Id.* at 44. But Mr. Hall did not stop. He knew "that when you run from the police, that you're going to get beat down when they pull you over. So I wanted to go somewhere where there was a lot of witnesses so nobody would get shot or beat or any of that stuff. I just didn't want to be stopped out in the country where there was nobody around." *Id.* After his arrest Mr. Hall did not tell the police about Lee or that Lee and Morrison had dropped him off at the halfway house; he is not a "snitch" and does not tell on people. *Id.* at 47.

Trial testimony corroborated parts of Mr. Hall's alibi. Lorence confirmed that [Mr. Hall] had been living with her from August to November of 2006, and that he had left without permission from his probation officer after she had a fight with him in early November. Mr. Hall's sister Connie remembered his visiting her at the hospital on November 7, and stated that he was accompanied by Morrison and a clean-shaven man in his early to mid-30's with dark hair and a dark complexion.

She also testified that Wing had called her in December 2006 and said that, from a window, she had seen Mr. Hall outside the halfway house on the day of the robbery, but because it was getting close to count time she was afraid she would get in trouble if she went out to speak with him.

Despite this corroboration, the alibi had serious holes. For example, how did Lee get the truck that he was driving just before the police chase, and why would Lee give all the money to Morrison (except for $101 from the teller's drawer not accounted for in the bag found by the road)? But the government did not rely solely on those holes and the strength of its case in chief; it also undertook to rebut the alibi through additional evidence.

-7-

Wing testified that although she had spoken with Mr. Hall during the summer of 2006, she had not had any further contact with him before the robbery.

She went back to the halfway house in early November 2006 after having violated her supervised release, but she could think of no way that he could have known she was there on November 7.

Wing also recounted how Mr. Hall had tried to convince her to be an alibi witness. After he had been arrested for the bank robbery, she saw him while at the halfway house. As she was smoking outside, he yelled to her from the recreational yard of the federal detention facility, which is part of the same complex, telling her that his sister Connie was going to call her. Connie called the same day and told her that Mr. Hall was in the detention center, that his mother needed to talk to her "more about it," and that he "needs you to help him." Trial Tr., Doc. 151 at 529.

Mr. Hall's mother called Wing in early 2007, after she was released from the halfway house. The two had lunch together and Mr. Hall's mother handed her a letter from Mr. Hall. Wing "didn't really" read the letter. *Id.* at 531. She later agreed to meet a second time with Mr. Hall's mother, who gave her another letter from Mr. Hall and told her "some things that I needed to do. Like I needed to have a watch on. . . . And she gave me a watch to wear so I could say something around two o'clock I was with him, seeing him at the half-way house." *Id.* at 531-32. Also, Mr. Hall mailed two or three letters for Wing to her brother's house in Kansas City, Kansas. Mr. Hall's letters said that she "could really help him out because they couldn't really identify him at the bank. They had a description wrong." Id. at 535. The letters instructed her to say that she was with him at the halfway house at approximately 2 p.m. on November 7, 2006, and that two men had dropped him off and left him talking with Wing. But two o'clock is count time at the halfway house, so she could not have met with Mr. Hall then; and she was not about to go along with the story because she "didn't want to get up here and lie and go back to prison again." *Id.* at 536. Wing denied telling Connie that she had seen Mr. Hall on November 7. She did, however, admit on cross-examination that she did not keep Mr. Hall's letters or give them to her probation officer or any police officer.

The government also attempted to rebut the alibi testimony using evidence of Mr. Hall's prior crimes.

United States v. Hall, 625 F.3d 673, 675-80 (10th Cir. 2010).

On October 7, 2008, a jury found defendant guilty of armed bank robbery; using, carrying or brandishing a firearm during and in relation to a crime of violence; and possession of a firearm by a convicted felon. See Verdict (Doc. #104). Defendant asked for a mistrial because (1) the Court

-8-

referred to his specific prior convictions when reading the indictment to the jury, and (2) the evidence was insufficient for a jury to find him guilty of the charged offenses. The Court found that the reference to defendant's prior conviction was not prejudicial because defendant planned to testify in any event and the Court independently admitted testimony about his prior offenses. See Memorandum And Order (Doc. #140) filed June 2, 2009 at 6. In overruling defendant's argument based on the sufficiency of the evidence, the Court found that even though the government presented circumstantial evidence, the evidence was substantial and overwhelming, and consisted primarily of the following: defendant was driving a vehicle which matched the description provided by bank employees; he attempted to elude police by driving for an extended period at a high rate of speed; during the chase, he and/or his passenger threw items from the vehicle including a shotgun (an exact match to the one used during the bank robbery), clothing items and money (including bank bait bills); one of the items discarded from the vehicle was a dark colored ski mask similar to that worn by the bank robber with DNA matching that of defendant on the mask; a Wal-Mart receipt in the vehicle showed the purchase of a dark colored ski mask and gloves; video surveillance showed that defendant and Morrison had gone to Wal-Mart the night before the robbery and purchased the mask and gloves; defendant testified that he loaned the vehicle to Morrison and another individual the day of the bank robbery for approximately one hour while he went to visit a former girlfriend at a halfway house in Leavenworth; several months after the government charged defendant, he sent letters to his former girlfriend and asked her to say that she was with him at the halfway house at approximately 2:00 p.m. on November 7, 2006; and defendant's former girlfriend testified that she was not with defendant that day at any time. See id. at 7-8.

On June 10, 2009, the Court sentenced defendant to 594 months in prison.

On appeal, defendant argued that during voir dire, the Court erred by referring to his conviction for bank robbery in 1984,[2] the prosecutor exceeded the scope of permissible questioning about his prior offenses, and during closing argument, the prosecutor improperly referred to defendant's credibility in light of his prior convictions. The Tenth Circuit affirmed. See United States v. Hall, 625 F.3d 673 (10th Cir. 2010). The Tenth Circuit held that the district court's erroneous reference to defendant's prior conviction was harmless, the prosecutor's questioning did not substantially prejudice him and the prosecutor's comments during closing argument were not clearly improper.

Forrest A. Lowry initially represented defendant. Defendant alleged that he did not have faith in Lowry and did not believe that Lowry had given his case adequate attention. Defendant stated that he sought new counsel because under the local policy of the U.S. Attorney, Lowry would not allow defendant to personally review discovery. See Transcript Of Sentencing (Doc. #162) at 7-8; Traverse To The United States' Response To Hall's Motion Pursuant To 28 U.S.C. § 2255 (Doc. #203-1) at 2, 6. On May 15, 2007, at a hearing on defendant's pro se motion for new counsel, the Court allowed Lowry to withdraw and appointed Robin D. Fowler to represent defendant. Fowler represented defendant throughout the remaining pretrial proceedings and trial. In

---

[2]        Defendant has admitted robbing four banks: (1) Shawnee Federal Savings, Topeka, Kansas on August 13, 1984 (guilty plea in D. Kan. No. 84-40051-01); (2) Interstate Federal Savings & Loan, Overland Park, Kansas on August 17, 1990 (guilty plea in D. Kan. No. 92-20023-01); (3) Bank IV, Overland Park, Kansas on August 3, 1990 (admitted robbery but charge dismissed as part of guilty plea in D. Kan. No. 92-20023-01); and (4) Bank IV, Mission, Kansas on August 24, 1990 (admitted robbery but charge dismissed as part of guilty plea in D. Kan. No. 92-20023-01). In this case, defendant was also convicted of the robbery of MidAmerican Bank and Trust in Leavenworth, Kansas on November 7, 2006. Defendant was charged with a sixth bank robbery involving UMB Bank on October 31, 2006 in Topeka, Kansas, but the government dismissed those charges without prejudice pending trial of the charges related to the robbery of MidAmerican Bank on November 7, 2006.

December of 2008, based on defendant's insistence that communication and trust with Fowler had completely broken down and that he did not believe a word that his attorney said, the Court allowed Fowler to withdraw and appointed Wendel S. Toth to represent defendant. In July of 2009, shortly after he filed an appeal, Toth asked the Tenth Circuit to appoint new counsel because of a breakdown in communication primarily related to disagreement on what issues to pursue on appeal. On July 8, 2009, the Tenth Circuit allowed Toth to withdraw and appointed Madeline Cohen, an Assistant Federal Public Defender, to represent defendant on appeal.

On February 16, 2012, defendant filed a pro se motion to vacate his sentence under 28 U.S.C. § 2255. Liberally construed, defendant's 83-page motion asserts that Fowler was ineffective in nearly every aspect of this case. Specifically, defendant argues that Fowler provided ineffective assistance because (1) he did not conduct adequate pretrial investigation related to DNA evidence, (2) he did not independently verify the investigator's conclusions about the willingness of witnesses to testify and the usefulness of their testimony, (3) he did not ensure that defendant's prior convictions for bank robbery were excluded at trial,[3] (4) he did not call certain witnesses, (5) he did

---

[3]     Defendant's third claim includes nine sub-claims: (1) Fowler should have asked for a pretrial ruling under Rule 404(b), Fed. R. Evid., Motion Under 28 U.S.C. § 2255 (Doc. #184) at 27, 58; (2) Fowler purposefully introduced defendant's prior arrests "to curry favor with the court in avoiding a costly mistrial," id. at 43-44; (3) without defendant's consent, Fowler included statements in defendant's motion to sever counts that defendant intended to testify regarding the MidAmerican Bank case, id. at 45-46, and that ultimately he was forced to testify because Fowler allowed evidence of his prior convictions to be admitted; (4) Fowler did not tell defendant that at side bar during voir dire, the prosecutor withdrew her request to admit defendant's prior convictions under Rule 404(b), id. at 29-30; (5) Fowler did not request a curative instruction about defendant's prior bank robbery convictions, id. at 44, 75; (6) Fowler failed to present the agreed upon alibi defense without defendant testifying, id. at 59; (7) Fowler failed to notify the Court that the prosecutor falsely represented to the Court that defense counsel had opened the door to prior convictions to rebut and impeach his defense, id. at 68-81; (8) Fowler failed to object to the prosecutor's improper questions on cross-examination of defendant about his prior convictions, id. at 36; and (9) Fowler failed to object to the prosecutor's closing comments about defendant's prior convictions, id.

not effectively cross-examine government witnesses, (6) he did not notify the Court of differences between defendant and counsel, (7) he did not object to the discovery practice of the U.S. Attorney's Office, (8) he did not challenge the jury instruction on aiding and abetting, (9) he did not offer certain jury instructions, and (10) he abandoned his duty of loyalty.[4]  Defendant also argues that sentencing counsel (Toth) and appellate counsel (Cohen), provided ineffective assistance because they did not argue for application of Amendment 599 to the Sentencing Guidelines.

### Analysis

The standard of review of Section 2255 petitions is quite stringent.  The Court presumes that the proceedings which led to defendant's conviction were correct.  See Klein v. United States, 880 F.2d 250, 253 (10th Cir. 1989).  To prevail, defendant must show a defect in the proceedings which resulted in a "complete miscarriage of justice."  Davis v. United States, 417 U.S. 333, 346 (1974).

To establish ineffective assistance of counsel, defendant must show that (1) the performance of counsel was deficient and (2) a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.  Strickland v. Washington, 466 U.S. 668, 687, 694 (1984).  To meet the first element, i.e. counsel's deficient performance, defendant must establish that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id. at 687.  In other words, defendant must prove that counsel's performance was "below an objective standard of reasonableness."  United

---

[4]    On January 2, 2013, the Court overruled defendant's motion to file supplemental claims under Missouri v. Frye, 132 S. Ct. 1399 (2012), and Lafler v. Cooper, 132 S. Ct. 1376 (2012). See Memorandum And Order (Doc. #206) at 2-3.  In his proposed supplemental claims, defendant asserted that counsel provided ineffective assistance because he did not re-enter plea negotiations after the government dismissed Counts 4, 5 and 6 related to the robbery of UMB Bank in Topeka, Kansas. Motion For Permission To File Supplemental Brief On Claims (Doc. #202) at 1. Defendant does not explain how counsel could have been derelict in failing to re-enter plea negotiations while he simultaneously maintains his innocence on all charges.

States v. Walling, 982 F.2d 447, 449 (10th Cir. 1992).  The Supreme Court recognizes, however, "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689; see United States v. Rantz, 862 F.2d 808, 810 (10th Cir. 1988).

Initially, the Court notes that defendant has challenged as ineffective nearly every aspect of Fowler's performance during pretrial investigation and trial.  Strickland, however, mandates that the Court be "highly deferential" in its review of counsel's performance and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689.  The Court must not second-guess counsel's assistance with the benefit of hindsight simply because defendant was convicted.  See id.  Here, although counsel did not secure defendant's acquittal, his strategy and conduct was reasonable and highly competent.  Based on the Court's observations of counsel's performance at trial and his obvious preparation, defendant's allegations are highly suspect both in number and in substance.  Below, the Court addresses each of defendant's claims.

## I.      Pretrial Investigation (Claim 1)

Defendant argues that Fowler was ineffective because he did not conduct a meaningful pretrial investigation.  In particular, defendant claims that counsel did not investigate DNA evidence and explain to Dr. Dean Stetler, defendant's retained DNA expert, what specific testing was necessary.  Defendant asserts that the DNA profile on the ski mask and coat in his car "possibly" matched the partial DNA profile on the shotgun (which the government expert conceded excluded defendant and Morrison as contributors).  Motion Under 28 U.S.C. § 2255 (Doc. #184) at 5.  Defendant concludes that if Stetler had conducted further testing and testified that defendant and Morrison were not sources of the DNA on the ski mask and coat, the results of the trial would have

been different.  Id. at 6.

Defendant's claim is directly refuted by the record – which reflects that defense counsel decided not to call Stetler because his testimony "would hurt petitioner more than it would help." Id.  In particular, counsel explained to defendant that Stetler would testify that defendant's DNA was "the major contributor on the mixture of the ski mask."  Id. at 6-7.  That conclusion was consistent with the testimony of the government expert witness.  Defendant reasons that counsel could have explained that defendant's DNA was only on the ski mask because government experts cross-contaminated DNA from defendant's sample with DNA on the ski mask or Special Agent Arch Gothard planted defendant's DNA on the ski mask.  Defendant has not proffered credible support for any such theories.  Counsel's decision not to pursue defendant's suggested strategy was not deficient or prejudicial.  At trial, defense counsel vigorously contested the government's DNA evidence by noting the lack of testing inside the gloves, the lack of testing of hairs on the ski mask, the fact that the ski mask contained the DNA of another unknown individual, the ease of transfer of DNA, and the possibility that defendant's DNA might have transferred to the ski mask even if he did not put it on (e.g., defendant put his hand in the plastic bag containing the mask to grab a pack of cigarettes, and various other scenarios).  See Transcript Of Trial (Doc. #151) at 609-12. Defendant has not shown that counsel's strategy in challenging the DNA evidence without calling Stetler to testify was below the wide range of reasonable professional assistance.  Strickland, 466 U.S. at 689.

Even if defendant could somehow show that counsel's strategy on DNA evidence  was deficient, he has not shown a reasonable probability that but for that strategy, the jury would not have convicted him.  Id. at 694.  As the Court noted in its order overruling defendant's motion for new trial, the evidence against defendant was "substantial and overwhelming."  Memorandum And

Order (Doc. #140) at 7.  On appeal, the Tenth Circuit noted that even if the district court induced

defendant to testify by reading his specific prior convictions, "the error was harmless because Mr.

Hall would undoubtedly have been convicted had he not testified."  625 F.3d at 675; see id. at 683

("And without the alibi defense[,] probably, even with it[,] the evidence was so overwhelming that

any reasonable juror would have found him guilty.").  Defendant has not shown that absent

counsel's alleged errors related to DNA evidence, the jury likely would have reached a different

result.  The Court therefore overrules defendant's first claim for relief.[5]

## II.      Failure To Independently Verify Investigator's Conclusions (Claim 2)

Defendant argues that Fowler provided ineffective assistance because he did not

independently verify his investigator's conclusions about the willingness of witnesses to testify and

the usefulness of their testimony.  Motion Under 28 U.S.C. § 2255 (Doc. #184) at 64.  To rebut the

"strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance," Strickland, 466 U.S. at 689, defendant may show that his attorney's representation was

unreasonable under prevailing professional norms and that the challenged action was not sound

strategy.  See Kimmelman v. Morrison, 477 U.S. 365, 384 (1986).  Counsel has a duty to make

reasonable investigations or to make a reasonable decision that particular investigations are

unnecessary.  Id.  A decision not to investigate must be assessed under the circumstances, applying

a "heavy measure of deference" to counsel's judgments.  Id. (quoting Strickland, 466 U.S. at 691).

A decision not to investigate cannot be deemed reasonable if it is uninformed, see Hooper v. Mullin,

---

[5]      Defendant raises numerous challenges to the billing statements by Fowler and Stetler.
Defendant claims that Fowler, Stetler and Genetic Technologies (the laboratory which counsel hired)
squandered money.  Defendant speculates that because Fowler did not detect over-billing and
mismanagement, he did not have any remaining funds for "Stetler's critical testimony."  Motion
Under 28 U.S.C. § 2255 (Doc. #184) at 13.  Defendant, however, has not shown that counsel's
failure to allow more testing by Stetler was deficient or prejudicial.

314 F.3d 1162, 1170-71 (10th Cir. 2002), but defendant has not shown that counsel's alleged decision was uninformed.

Here, the record reflects that Fowler reasonably relied on his investigator's conclusions regarding various witnesses.  See Wilson v. Simmons, 536 F.3d 1064, 1136 (10th Cir. 2008) (in preparing for trial, counsel may rely on efforts of co-counsel, investigators and experts and failure to conduct personal interviews not necessarily deficient performance); Walls v. Bowersox, 151 F.3d 827, 834 n.4 (8th Cir. 1998) (not unreasonable for lawyer to use surrogates to investigate and interview potential witnesses rather than doing so personally); Duran v. Bravo, No. CIV. 10-0743 JB/GBW, 2012 WL 2175768, at *13 (D.N.M. June 11, 2012) (attorney reliance on investigative reports reasonable); see also United States v. Glick, 710 F.2d 639, 644 (10th Cir. 1983) (attorney decision not to interview witnesses and rely on other sources of information, if made in exercise of professional judgment, not deficient performance).  Counsel's decision not to independently verify all of the investigator's conclusions was not deficient.  In addition, in light of the "substantial and overwhelming" evidence of his guilt, defendant has not shown a reasonable probability that but for counsel's failure to independently verify the investigator's conclusions, the result of the trial would have been different.  Memorandum And Order (Doc. #140) at 7; see Strickland, 466 U.S. at 694.

Defendant specifically challenges Fowler's failure to personally interview Wing after e-mail communications in which she expressed reluctance to testify.  In context, it appears that Wing did not want to testify for defendant because she did not want to admit that she had contact with him in violation of the terms of her probation and she did not think that her testimony would be helpful to him.  Defendant claims that Fowler should have taken various measures to ensure that Wing would testify for him (directly contrary to the rebuttal testimony at trial which discredited his alibi).  In e-mail communications with counsel's investigator, Wing stated that she could not recall seeing

-16-

defendant on November 7, 2006 and that she would not perjure herself and take a chance of going back to prison.  See Exhibit 22 to <u>Traverse To The United States' Response To Hall's Motion Pursuant To 28 U.S.C. § 2255</u> (Doc. #203-1).   In addition, counsel's investigator noted that defendant's sister (Lunsford) had stated that Wing remembered seeing defendant with another white male the day of the robbery.  <u>See id.</u>  Even if Wing had agreed to testify that she saw defendant with a white male on November 7, 2006 shortly before count time (2:00 PM), such testimony would not have provided defendant an alibi for the bank robbery at 1:36 PM.  Moreover, it could actually suggest that she saw him and Morrison (without Lee) minutes after the robbery.  In addition, even if Wing would have somehow provided defendant an alibi at 1:36 PM, defendant has not shown how such testimony would have exonerated him under the government's theory of aiding and abetting. In light of her reluctance to testify and her statements that her testimony would not help defendant, counsel could reasonably rely on his investigator's conclusion that Wing would not be a helpful witness.  Defendant has not shown that counsel's failure to personally interview Wing was deficient or prejudicial.

The Court overrules defendant's second claim for relief.

### III.    Failure To Obtain Exclusion Of Evidence Of Prior Convictions (Claim 3)

Defendant raises some nine related claims challenging counsel's failure to obtain exclusion of evidence of prior convictions for bank robbery: (1) Fowler should have asked for a pretrial ruling under Rule 404(b), Fed. R. Evid., <u>Motion Under 28 U.S.C. § 2255</u> (Doc. #184) at 27, 58; (2) Fowler purposefully introduced defendant's prior arrests "to curry favor with the court in avoiding a costly mistrial," <u>id.</u> at 43-44; (3) without defendant's consent, Fowler included statements in defendant's motion to sever counts that defendant intended to testify regarding the MidAmerican Bank case, <u>id.</u> at 45-46, and that ultimately he was forced to testify because Fowler allowed evidence of his prior

convictions to be admitted; (4) Fowler did not tell defendant that at side bar during voir dire, the prosecutor withdrew her request to admit defendant's prior convictions under Rule 404(b), id. at 29-30; (5)  Fowler did not request a curative instruction about defendant's prior bank robbery convictions, id. at 44, 75; (6) Fowler failed to present the agreed upon alibi defense without defendant testifying, id. at 59; (7) Fowler failed to notify the Court that the prosecutor falsely represented to the Court that defense counsel had opened the door to prior convictions to rebut and impeach his defense, id. at 68-81; (8) Fowler failed to object to the prosecutor's improper questions on cross-examination of defendant about his prior convictions, id. at 36; and (9) Fowler failed to object to the prosecutor's closing comments about defendant's prior convictions, id.

As noted above, defendant had two prior convictions for bank robbery: Shawnee Federal Savings in 1984 and Interstate Federal Savings & Loan in 1990.  Shortly before jury selection, the parties announced that they had reached a stipulation that defendant had been convicted of felonies before November 7, 2007 and under federal law, defendant could not own or possess any firearm. Trial Exhibit 132; see Old Chief v. United States, 519 U.S. 172 (1997).  As part of the Court's preliminary jury instructions, it read the entire Second Superseding Indictment – including Count 3 which referenced that defendant had been "convicted in 1984, of Bank Robbery, case number 84-40051-01; and in 1992, of Armed Bank Robbery and Use and Carry of a Firearm in Connection with a Crime of Violence, case number 92-20023-01." Second Superseding Indictment (Doc. #51) filed February 1, 2008.  Defense counsel moved for a mistrial because the Court had specifically mentioned the substance of the prior convictions.  Defense counsel admitted that even before the Court read the indictment, defendant intended to testify and that his direct examination would cover the 1992 conviction.  The Court overruled defendant's motion for a mistrial on the assumption that the government's case against defendant was overwhelming and that defendant could renew his

motion if the evidence was not substantial.  United States v. Sullivan, 108 F. App'x 579, 581-83

(10th Cir. 2004) (affirming denial of mistrial for reference to arson conviction in indictment because

jury heard no other reference to name or nature of prior felony conviction and substantial evidence

against defendant); see also United States v. Colon, 278 F. App'x 588, 593 (6th Cir. 2008) (mistaken

disclosure of prior conviction through reading of indictment harmless because district court

instructed jury that indictment was not evidence and no further mention of prior conviction at trial);

United States v. Clay, 346 F.3d 173, 177 (6th Cir. 2003) (inadvertent disclosure of nature of prior

conviction not reversible error where evidence overwhelming and error likely did not materially

affect verdict).

In written jury instructions, the Court included reference to prior "felony crimes," not the

specific nature of those crimes.  The Court also instructed the jury that an indictment is merely a

charge or accusation and not evidence of any kind against defendant and does not create any

presumption or permit any inference of guilt.  Instructions To The Jury (Doc. #103), Inst. No. 15.

The Court instructed the jury about the impact of a prior felony conviction as follows:

> You have heard evidence that the defendant has been convicted of a felony, that is,
> a crime punishable by imprisonment for a term of years.  The fact that the defendant
> has been convicted of another crime does not mean that he committed the crime
> charged in this case, and you must not use his prior conviction as proof of the crime
> charged in this case.  You may find him guilty of the crime charged here only if the
> government has proved beyond a reasonable doubt that he committed it.

Id., Inst. No. 5.

In light of the substantial evidence of defendant's guilt and the Court's admonitions about

the limited purpose of an indictment, the Court previously found that the isolated reference to

defendant's bank robbery convictions in 1984 and 1992 was not prejudicial.  See Memorandum And

Order (Doc. #140) at 5-6.  On appeal, the Tenth Circuit agreed that the voir dire reference to prior

convictions was harmless.  The Tenth Circuit stated as follows:

> Evidence of the 1984 conviction was elicited during Mr. Hall's testimony.
> Just before he began testifying, defense counsel stated his intention to bring out the
> 1992 conviction on direct examination (presumably to avoid the evidence having
> greater impact if first elicited during the government's cross-examination) and asked
> if the court would be willing to take a break before completion of direct testimony
> to rule on whether the government could impeach him under Rule 609 with the 1984
> conviction.  The court agreed, and defense counsel then proceeded to question Mr.
> Hall about the 1992 conviction for a 1990 bank robbery.  In fact, he also asked Mr.
> Hall about two other bank robberies in August 1990 – which the government had
> agreed not to prosecute in exchange for his 1992 guilty plea. Mr. Hall admitted that
> he committed those robberies and that he had pleaded guilty to using a firearm in
> connection with one of them.

> During the anticipated break the parties debated the admissibility of evidence
> of Mr. Hall's 1984 conviction.  In addition to arguing that it was admissible as
> impeachment under Rule 609, the prosecutor argued that it was admissible to rebut
> a contention of defense counsel in his opening statement.  Defense counsel had said:

>> We indicated in voir dire that Mr. Hall had committed bank robberies
>> before and he'll tell you that. And he will say that he spent a lot of
>> time in prison for that.  And he would not in 2006 at this time of his
>> life, rob a bank by using his own car and parking right behind the
>> bank with his own tag, that there's no way on earth he would do that.

> Trial Tr., Doc. 150 at 23-24.  This argument, the prosecutor asserted, opened the
> door to questioning Mr. Hall about prior bank robberies that shared similarities with
> the MidAmerican Bank robbery.  She noted in particular that in two of the prior bank
> robberies — the one in 1984 and one in 1990 — Mr. Hall had driven his vehicle to
> the robberies, had used a mask or otherwise concealed his identity, and had used a
> gun.  The court ruled that the 1984 conviction was too old to be admissible for
> impeachment under Rule 609, but that evidence of prior robberies could be used to
> rebut the contention by defense counsel in his opening statement.  When defense
> counsel asked for clarification of the ruling, the court stated: "The only ones I'm
> letting in are where he was driving a car that he was -- and it would refute [defense
> counsel's] argument."  Id., Doc. 148 (Hall Testimony) at 55.

> Defense counsel then elected to bring out the 1984 conviction in Mr. Hall's
> direct testimony. He admitted to having used his mother's car in the 1984 bank
> robbery, but asserted that at his present stage in life, he would "never park [his] own
> car out back behind a bank and go in and rob it."  Id. at 58.

> Thus, evidence of both the 1984 and 1992 bank robberies was admitted at
> trial.  The district court's mention of these during voir dire told the jury nothing that

it did not later learn, so Mr. Hall was not prejudiced.  Denial of his mistrial motion
was harmless.

Hall, 625 F.3d at 682-83.

Defendant argues that Fowler should have asked for a pretrial ruling under Rule 404(b), Fed.
R. Evid.  See Motion Under 28 U.S.C. § 2255 (Doc. #184) at 27, 58.  On September 12, 2008, the
Court held a hearing on the government's proposed Rule 404(b) evidence and deferred ruling until
trial.  See Clerk's Courtroom Minute Sheet (Doc. #80).  Because the Court declined to make a
specific ruling before hearing the evidence at trial, counsel's failure to seek a ruling before trial was
not deficient or prejudicial.

Defendant argues that Fowler purposefully introduced defendant's prior arrests "to curry
favor with the court in avoiding a costly mistrial."  Motion Under 28 U.S.C. § 2255 (Doc. #184) at
43-44.  Defense counsel's decision to "front" defendant's prior convictions on direct examination
– rather than wait for the government to bring them up on cross examination – was within the wide
range of reasonable professional assistance.  See Strickland, 466 U.S. at 689.  Counsel's strategy in
this regard was not deficient or prejudicial.  Defendant argues that Fowler told the Court that his
client was going to testify on the 1992 conviction anyway, as a way to cover for the Court.  Counsel
had previously indicated, however, that defendant was going to testify.  Fowler's statement about
defendant's intent to testify involved candor so that the Court did not grant a mistrial on a mistaken
assumption that defendant otherwise would not testify.  Defendant's claim that defense counsel
purposely tried to get his prior convictions into evidence so that the Court's error would be harmless
is wholly without merit.  Defendant does not explain any plausible motive for such a strategy.
Defendant asserts that counsel attempted to prevent a mistrial and ensure his conviction, but such
a motive would be utterly inconsistent with counsel's professional obligations and his conduct

before the Court over numerous years. From a review of the entire record, it is abundantly clear that counsel did not act to curry favor with the Court, but rather to pursue the most viable defense strategy available.

Defendant maintains that without his consent, in defendant's motion to sever counts, Fowler included statements that defendant intended to testify regarding the MidAmerican Bank case. Motion Under 28 U.S.C. § 2255 (Doc. #184) at 45-46. Defendant claims that Fowler ultimately forced him to testify by allowing evidence of prior convictions to be admitted.[6] The Court overruled a similar argument in defendant's motion for new trial. There, it stated as follows:

> Defendant . . . does not dispute that even before voir dire, he intended to testify and in particular, to address the 1992 conviction on direct examination. In addition, the Court explained at side bar that its ruling was based on the assumption that the government's evidence was overwhelming and that if the evidence turned out differently, defendant could renew his motion as part of a motion for judgment of acquittal. As explained below, the evidence of defendant's guilt was overwhelming. Defendant has not shown that the Court's ruling on his motion for mistrial influenced his decision to testify. Finally, as to the 1984 bank robbery conviction, the Court ruled that the government could ask defendant questions about that conviction to refute defense counsel's argument that defendant would not have driven his own vehicle to rob the bank in Leavenworth, Kansas. Because the Court admitted evidence of the 1984 bank robbery conviction on other grounds, the isolated reference to that conviction during voir dire was not prejudicial.

Memorandum And Order (Doc. #140) at 6. On appeal, the Tenth Circuit also concluded that the Court did not induce defendant to testify:

> Mr. Hall contends that the prior-crime evidence was elicited only because he elected to testify, and that he would not have testified if the court had not mistakenly mentioned his 1984 conviction during voir dire. We are not persuaded.

---

[6]    Before trial, defendant filed a motion for separate trials on the two charged bank robberies because he was going to testify about the Leavenworth robbery, but not the Topeka robbery. Kevin Hall's Supplemental Motion To Sever Counts (Doc. #73) filed August 5, 2008 at 2, 5. After the Court sustained defendant's motion to sever, defendant filed a notice of alibi which stated that he did not expect to call any alibi witness other than himself. See Kevin Tommie Hall's Notice Of Alibi (Doc. #88) filed September 22, 2008 at 1.

First, Mr. Hall never suggested to the district court that his decision to testify might be affected by whether it would lead to admission of the 1984 conviction. His pretrial notice of alibi stated that he would testify. At that time the district court had not ruled on whether the 1984 conviction would be admissible under either Rule 609 or Rule 404(b). Mr. Hall suggests that if he had known that the government would abandon its motion to introduce evidence of the 1984 conviction under Rule 404(b), he would have chosen not to testify. But that suggestion is not credible. He was certainly aware that if he testified, he would be impeached with evidence of the 1992 conviction (defense counsel never argued against its use for impeachment and even told the court at the time of the mistrial motion that he intended to mention the 1992 conviction during voir dire) and presumably counsel had also been preparing to elicit on direct examination that Mr. Hall had committed two other bank robberies in 1990. Even if Mr. Hall thought that evidence of the 1984 conviction would be harmful and he would prefer to have it excluded, it is impossible to believe that the threat of the admission of that evidence would deter him from testifying when the admission of evidence of his three other bank robberies would not. The additional impeachment could not have been a significant factor in his deciding whether to testify.

In any event, were we to assume that Mr. Hall would not have testified if the district court had not mistakenly mentioned the 1984 conviction in voir dire, he is still not entitled to relief. The court's error that allegedly compelled him to testify is ground for reversal only if there is a "grave doubt" that the outcome of the trial would have been different had he not testified. [United States v.] Patterson, 561 F.3d [1170,] 1172 [(10th Cir. 2009)] (internal quotation marks omitted). But we are convinced that he would have been convicted anyway. As he stated in his notice of alibi, he was the only witness who would testify to the alibi. And without the alibi defense (probably, even with it), the evidence was so overwhelming that any reasonable juror would have found him guilty. In other words, any error in inducing him to testify was harmless.

Hall, 625 F.3d at 683.

Defendant's present argument is that Fowler (instead of the Court) did not give him the ultimate decision whether to testify. Counsel's advice whether defendant should testify is a matter of trial strategy. See Hooks v. Ward, 184 F.3d 1206, 1219 (10th Cir. 1999). "Although counsel should always advise the defendant about the benefits and hazards of testifying and of not testifying, and may strongly advise the course that counsel thinks best, counsel must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant, and counsel must abide by the defendant's decision on this matter." Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997); see United

-23-

States v. Dryden, 166 F.3d 1222, 1998 WL 930582, at *1 (10th Cir. Apr. 22, 1998).  Where

defendant had issues with counsel, he was well aware of avenues to seek judicial redress.[7]  Given

his numerous prior convictions, the Court would infer that he was well aware that he had the right

to choose whether to testify.  The Court is confident that if defendant truly felt that counsel

compelled him to testify against his will, defendant would have filed a pro se motion or otherwise

informed the Court.  At the beginning of his trial testimony, defendant acknowledged that he

understood that he did not have to testify.  See Transcript of Trial (Doc. #148) at 3.  Defendant has

not alleged specific facts which would establish that counsel's performance was deficient in this

regard.

Even if trial counsel had not advised defendant that he had the ultimate right to decide

whether to testify, the alleged error was not prejudicial.  Defendant has not shown a reasonable

probability that had he not testified, the jury would have reached a different result.  The jury took

approximately three hours to reach its verdict.  From the Court's perspective, the jury would not

have deliberated so long if defendant had not testified.  The probable scenario is that given the

government witness testimony and the lack of any witness to corroborate defendant's version of

events, the jury would have promptly concluded that defendant was guilty if he had not testified.

Defendant's testimony undoubtedly prolonged the deliberations, but the Court has no reason to

believe that it changed the result.  Accordingly, trial counsel's alleged error in failing to advise

---

[7]        Between the filing of the indictment and sentencing, defendant filed eight pro se
motions or requests.  See Doc. #30 (pro se request for injunction regarding collecting of DNA
sample) filed February 13, 2007; Doc. #36 (pro se request for new counsel) filed May 10, 2007;
Doc. #106 (pro se request for discovery) filed November 25, 2008; Doc. #108 (pro se request to
produce documents) filed November 24, 2008; Doc. #109 (pro se request to terminate Fowler) filed
December 8, 2008; Doc. #110 (pro se motion to appoint new counsel) filed December 8, 2008; Doc.
#117 (pro se motion for discovery) filed December 30, 2008; Doc. #136 (pro se ex parte request for
documents) filed May 22, 2009.

defendant that he had the ultimate right to decide whether to testify was not prejudicial. See Strickland, 466 U.S. at 694.

Defendant maintains that Fowler provided ineffective assistance when he did not tell defendant that at side bar during voir dire, the prosecutor withdrew her request to admit defendant's prior convictions under Rule 404(b). Motion Under 28 U.S.C. § 2255 (Doc. #184) at 29-30. Defendant apparently claims that he would not have testified if he had known that the government had withdrawn its request to admit the prior convictions under Rule 404(b). As explained above, the record reflects that defendant intended to testify in any event.[8] Counsel's failure to immediately inform defendant about the Court's ruling was not deficient or prejudicial because defendant had no other witnesses to maintain an alibi defense. As the Tenth Circuit noted, without the alibi defense, "the evidence was so overwhelming that any reasonable juror would have found him guilty." Hall, 625 F.3d at 683.

Defendant complains that counsel did not request that the Court give a curative instruction about the prior bank robbery convictions. Motion Under 28 U.S.C. § 2255 (Doc. #184) at 44, 75. The decision to request a curative instruction or other remedy is a matter of trial strategy. See United States v. Chapman, 593 F.3d 365, 368 (4th Cir. 2010) (decisions regarding mistrial are tactical decisions entrusted to sound judgment of counsel); United States v. Washington, 198 F.3d 721, 724 (8th Cir. 1999) (decision to move for mistrial involves numerous alternative strategies such as remaining silent, interposing objection, requesting curative instruction or requesting end to

---

[8]        Here, defendant filed a number of pro se motions and letters, and he had experience in several bank robbery cases. The Court is therefore certain that after defendant received notice of alibi defense or the supplement to the motion to sever counts, he would have immediately informed the Court. Why would defendant ask for new counsel based on failure to share discovery yet not inform the Court that counsel had filed documents falsely stating that he intended to testify?

proceeding).  Counsel could have reasonably concluded that a curative instruction would only highlight defendant's prior convictions and that the better course was to rely on the Court's general instruction regarding prior felony crimes at the end of the case.  See United States v. Harris, 14 F. App'x 144, 146 (4th Cir. 2001) (reasonable trial strategy to forego curative instruction that would remind jurors of particular evidence); Cooper v. Zavaras, No. 08-cv-2480-MSK, 2010 WL 4449450, at *18 (D. Colo. Nov. 1, 2010) (defense decision not to emphasize comments by requesting curative instruction falls within bounds of reasonable trial strategy).  Even if counsel was somehow deficient in not seeking an immediate curative instruction, defendant has not shown a reasonable probability that but for counsel's failure to do so, the result of trial would have been different.  Strickland, 466 U.S. at 694.

Defendant next argues that Fowler failed to present the agreed alibi defense without defendant testifying.  Motion Under 28 U.S.C. § 2255 (Doc. #184) at 59.  Defendant argues that counsel virtually ensured that he would be convicted by putting him on the stand. While defendant's chances of acquittal were slim with – or without – such a strategy, counsel reasonably concluded that defendant's alibi defense was more likely to succeed if defendant testified.  Absent testimony by defendant, the only witness in support of the alibi would be Wing (who had stated before trial that she would not perjure herself to help defendant and who testified for the government in rebuttal to discredit defendant's alibi).  Even under defendant's version of Wing's "true" observations, she only briefly saw defendant with a white male individual shortly before 2:00 PM.  Defendant has not shown a reasonable probability that absent his own testimony, a jury would have reached a different conclusion on his alibi defense.  Counsel's alleged failure in this regard was not deficient or prejudicial.

Defendant argues that Fowler failed to notify the Court that the prosecutor falsely

represented to the Court that defense counsel had opened the door to prior convictions to rebut and impeach his defense. Motion Under 28 U.S.C. § 2255 (Doc. #184) at 68-81.[9]  Defendant has not shown precisely how counsel could have formulated a valid objection to evidence of his prior convictions and maintain an alibi defense. Even if the Court assumes that counsel was somehow deficient in this regard, defendant has not shown a reasonable probability that if counsel employed such a strategy (which would necessarily include defendant not testifying), the result of the trial would have been different.

Defendant argues that Fowler failed to object to improper questions on cross-examination of defendant about prior convictions. Id. at 36. Defendant also contends that Fowler was ineffective because he did not object to questions about prior convictions which exceeded the scope of the Court's ruling. In rejecting a similar argument on direct appeal, the Tenth Circuit stated as follows:

> Mr. Hall next contends that his cross-examination by the prosecutor exceeded the scope of what the district court said it would permit regarding his prior offenses. The prosecutorial misconduct, he argues, deprived him of due process and a fair trial. In our view, however, the complained-of cross-examination was too trivial in importance to have prejudiced him.
>
> After the prosecutor elicited Mr. Hall's admission that he had used his mother's car to commit the 1984 robbery, she began to question him about other similarities between the 1984 robbery and the charged offense:
>
> > Q.    And when you went in there, you had something covering your head, correct?
> > A.    Uh, I think I had a pillow case over my head, yeah, that's correct.
> > Q.    Okay. And you had a gun, correct?
>
> Trial Tr., Doc. 148 (Hall Testimony) at 61. Defense counsel did not object, but the court called the prosecutor to the bench and advised her that it had not intended to allow questioning about the details of the prior robberies, only whether or not Mr. Hall's cars were used in their commission. The prosecutor responded that she would

---

[9]    This entire portion of defendant's memorandum appears to be a duplicate of his pro se supplemental memorandum filed on appeal.

"move on."  *Id.* at 61-62.

The prosecutor then asked Mr. Hall about his attempted burglary of a gas station in June 1990, two months after completing his prison sentence for the 1984 bank robbery.  He admitted that he had parked his own car in the parking lot of the gas station.  She next asked Mr. Hall about the three August 1990 bank robberies that had already been brought out on direct examination.  He admitted that in committing one of the robberies he had used a car that was registered to his mother but belonged to him.  He also admitted to having worked with an accomplice in those robberies, and committing at gunpoint the one to which he pleaded guilty.  Again, defense counsel did not object.

On appeal Mr. Hall argues that this questioning exceeded the limits of what the district court had set.  Defense counsel, however, failed to object in district court to the cross-examination that he challenges on appeal.  Therefore, we review only for plain error.  *See United States v. Caraway*, 534 F.3d 1290, 1298 (10th Cir. 2008).  "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects [the defendant's] substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Id. (internal quotation marks omitted)  The defendant has the burden of establishing all four elements of plain error.  *See United States v. Gonzales*, 558 F.3d 1193, 1199 (10th Cir. 2009).

We agree with Mr. Hall that the prosecutor's questioning about his prior offenses went beyond what the district court had approved.  But he has failed to establish the third element of plain error — that the error substantially prejudiced him.  In light of the history of his criminality that was properly presented to the jury, we fail to see how the jury would be influenced by the additional evidence that he had an accomplice, used a gun, or wore a mask during a prior robbery.  The obvious reason why defense counsel did not object at trial is that it was not worth the effort.  *Cf. United States v. Short*, 947 F.2d 1445, 1455 (10th Cir. 1991) (prosecutor's questioning that exceeded the scope of the court's evidentiary ruling and brought out details about the defendant's prior conviction was harmless error in light of the "overwhelming evidence" against the defendant and defense counsel's failure to "request the court to strike the testimony or to give a limiting instruction").

625 F.3d at 683-84.  For these reasons and those stated elsewhere in the record, the Court finds that counsel's failure to object to the scope of questions about defendant's prior convictions was not deficient or prejudicial.

Defendant finally argues that Fowler failed to object to the prosecutor's closing comments about his prior convictions.  Motion Under 28 U.S.C. § 2255 (Doc. #184) at 36.  Prosecutors

generally have latitude in making closing arguments when defense counsel invites the argument.

United States v. Anaya, 727 F.3d 1043, 1056 (10th Cir. 2013); United States v. Hernandez-Muniz,

170 F.3d 1007, 1012 (10th Cir. 1999) (prosecutors have "considerable latitude" to respond to

argument by opposing counsel).  Counsel's failure to object to the prosecutor's comments during

closing was not deficient or prejudicial.

> Here, the prosecutor argued in closing as follows:

> In the defendant's opening statement there was an argument that Kevin Tommie Hall
> would have been smarter than to go to the bank in Leavenworth, Kansas driving his
> own vehicle to rob a bank.  Well, we know, because of his past experience, that he
> has on at least three occasions driven his own vehicle to go commit serious felony
> crimes.  Two of those were, in fact, bank robberies by his own admission.  And we
> know, because of his testimony yesterday, that he's committed four prior bank
> robberies, two of which he got away with.  And so this argument that he would have
> been smarter, you know, he had a 50-50 shot at going there, robbing it and getting
> away.  And so kind of think through and process all of those thought processes that
> the defendant would have had back on November 7th of 2006.  * * *

> You've got the evidence sitting right over there on the table.  You know that the
> defendant was a convicted felon, you know about his past, and based upon all of the
> evidence that you've heard in this case, we're asking that you find him guilty of all
> three counts.

Transcript Of Trial (Doc. #151) at 592, 604.  On direct appeal, the Tenth Circuit found that the

above comments were not clearly improper.  Hall, 625 F.3d at 685 (when read in context, prosecutor

was arguing that defendant's criminal history would not necessarily have taught him that it was

foolish to take his own car to a bank robbery, because half the time that he had done so, he had not

been caught); id. (not "wholly out-of-bounds" to mention prior conviction because it was element

of a charged offense).

> During rebuttal closing argument, the prosecutor stated as follows:

> [Defense counsel] said the reason he didn't tell Agent Gothard about Lee was
> because he didn't want to snitch anybody out.  Here you have an individual who's
> a multi-convicted felon and he's being accused of a serious offense and he's not

going to tell that there was a third person there?  Knowing full well that he's a suspect in the case?  How much sense, honestly, does that make?

* * *

Instruction Number 20 is the aiding and abetting instruction.  If you remember, during the course of the defendant's testimony, he said, yeah, we're driving and there's all this stuff being thrown out, I don't even know it was being thrown out, but at some point he realized there was stuff being thrown out and so he says something to Morrison and Morrison said, yeh, well, Lee just robbed something. Does Hall pull over at that moment and say, hold on, whoa, I don't want any part of this? You know, he drives by that funeral procession, you talk about the best place to pull over and say I give up would have been right there.  And what does he do? He keeps going. He keeps going and he keeps going.  He thinks he's going to get away.  He's gotten away before.  He ditched the evidence.  And it's not until he's stop sticked and he can't go anymore that he finally stops.  Not because that's the safest place to stop, but because he can't get away.  He knows he's caught.

* * *

And then he's talked to, he admits to you or tells you today, I lied to the police, but you need to believe what I told you under oath after being a multi-convicted felon. Based upon all the evidence we're asking you to find the defendant guilty of the three counts because he is, in fact, guilty.

Transcript Of Trial (Doc. #151) at 626, 629-30.

Again, on direct appeal, the Tenth Circuit found that the above comments were not clearly improper.  Hall, 625 F.3d at 685 (within limits of proper argument to suggest that innocent person with long criminal record would promptly state alibi to avoid further legal difficulty); id. at 686 (proper argument to support fall-back theory of aiding and abetting by pointing out that even after Hall knew that Morrison had been involved in robbery, he continued to assist Morrison's flight); id. (clear import of comment that as a multiconvicted felon, Hall not credible, consistent with rationale for Rule 609).  Counsel's failure to object to the prosecutor's comments during closing was not deficient or prejudicial.

For the above reasons, the Court overrules defendant's third claim and related sub-claims that Fowler was ineffective in failing to obtain exclusion of evidence of defendant's prior

-30-

convictions.

## IV.    Failure To Call Certain Witnesses (Claim 4)

Defendant argues that counsel was ineffective because he did not call Shawna Tripp, Jessica

Tripp, Mr. Morrison's landlord, Scott Phillips, Jeff Smith, Bob Cantwell and an unknown female

who was at the halfway house on November 7, 2006. Defendant has not offered affidavits of any

of these witnesses.[10] To warrant an evidentiary hearing on a claim that counsel failed to interview

or subpoena a witness, defendant must provide an affidavit of the potential witness as to the nature

of the proposed testimony. See United States v. Ashimi, 932 F.2d 643, 650 (7th Cir. 1991) (to show

ineffective assistance, evidence about testimony of putative witness must generally be presented by

witness testimony or affidavit); Sanders v. Trickey, 875 F.2d 205, 210-11 (8th Cir. 1989) (failure

to provide affidavit from witness regarding potential testimony precludes finding of prejudice);

United States v. Schaflander, 743 F.2d 714, 721 (9th Cir. 1984) (to warrant evidentiary hearing,

movant must submit affidavit or sworn statement from witness or counsel); United States v. Cosby,

983 F. Supp. 1022, 1026 (D. Kan. 1997) (prejudice not established where defendant did not submit

affidavit of potential alibi witnesses); see also Snow v. Sirmons, 474 F.3d 693, 730 n.42 (10th Cir.

2007) (to show prejudice, habeas petitioner must show not only that testimony of uncalled witness

---

[10]    In light of the overwhelming evidence of defendant's guilt, defendant's statements about the proposed witness testimony are speculative and utterly insufficient to warrant an evidentiary hearing. See Motion Under 28 U.S.C. § 2255 (Doc. #184) at 23 (Tripp sisters "may not have been interviewed at all" and "may have been able to identify the real assailant"); id. at 23 (Morrison's landlord would testify to evicting Morrison on November 6, 2006 and placing his belongings outside residence based on failure to pay rent); id. at 24 (Phillips, defendant's parole officer, aware of exact nature of his involvement with Wing and that she perjured herself at trial); id. (on November 2, 2006, Smith placed call to Wing and apparently overheard her tell defendant that she was waiting to be transported to halfway house); see also Traverse To The United States' Response To Hall's Motion Pursuant To 28 U.S.C. § 2255 (Doc. #203-1) at 28 (if counsel confronted Wing with Cantwell statement, "she may have recanted"); id. at 30 ("Cantwell would have possibly persuaded Wing to tell the truth").

would have been favorable, but that witness would have testified); <u>United States v. Cervini</u>, 379 F.3d 987, 994 (10th Cir. 2004) (no evidentiary hearing required without firm idea of what testimony will encompass and how it will support claim); <u>United States v. Jones</u>, 124 F.3d 218 (Table), 1997 WL 580493, at *1 (10th Cir. Sept. 19, 1997) (certificate of appealability on ineffective assistance claim denied because defendant did not present specific facts to show that co-defendant would have offered exculpatory evidence). Absent an affidavit from the proposed witnesses, defendant has failed to show a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Strickland</u>, 466 U.S. at 694.

The Court overrules defendant's fourth claim for relief.

## V. Failure To Effectively Cross Examine Government Witnesses (Claim 5)

Defendant claims that counsel was ineffective because he did not effectively cross-examine government witnesses including George Seifert, Mary Garrison, Debbie Smith and Special Agent Gothard. Trial strategy includes determining how best to cross-examine witnesses. <u>See</u> <u>Pickens v. Gibson</u>, 206 F.3d 988, 1002 (10th Cir. 2000); <u>Glick</u>, 710 F.2d at 644 (selection of questions is matter of "strategic choice"). The manner in which counsel cross-examines a witness is a strategic choice and therefore "virtually unchallengeable." <u>Kessler v. Cline</u>, 335 F. Misprision 768, 770 (10th Cir. 2009) (quoting <u>Strickland</u>, 466 U.S. at 690). Defense counsel aggressively cross-examined government witnesses, and his questions evidenced a well-informed understanding of the case. <u>See</u> <u>United States v. Marr</u>, 856 F.2d 1471, 1472 (10th Cir. 1988) (judge may rely on personal knowledge or recollection). Defendant has not shown that further pretrial investigation would have allowed counsel to better cross-examine the witnesses. <u>See</u> <u>Moore v. Gibson</u>, 195 F.3d 1152, 1179 (10th Cir. 1999); <u>see also</u> <u>Church v. Sullivan</u>, 942 F.2d 1501, 1513 (10th Cir. 1991) (defendant bears burden of establishing how more extensive cross-examination would have changed outcome of trial). On

this record, the Court must assume that even if defense counsel had conducted a more thorough pretrial investigation and interviews of government witnesses before trial, their testimony would not have changed in any material respect.[11] Defendant has not shown a reasonable probability that but for counsel's alleged error, the results of trial would have been different. See Strickland, 466 U.S. at 694.

Defendant also claims that Fowler provided ineffective assistance because he failed to show that Wing was lying when she testified at trial that (1) she went back to the halfway house on November 1, 2006, (2) she had no contact with defendant between the summer of 2006 and November 7, 2006, and (3) she did not see defendant on November 7, 2006 through a window at the halfway house. Defendant maintains that Wing actually went back to the halfway house on November 2, 2006 and that he had contact with her between the summer of 2006 and November 7, 2006, but he does not explain how – even if true – these discrepancies are material. As to whether Wing saw defendant on November 7, 2006, defendant's sister testified that Wing said that she saw

---

[11]     As to Seifert, defendant claims that Fowler should have told the Court that the prosecutor improperly allowed the witness to be present in the courtroom when defendant returned from recess and then used a pre-arranged coded response to one of the prosecutor's preliminary questions to inform the prosecutor whether he could positively identify defendant. Motion Under 28 U.S.C. § 2255 (Doc. #184) at 38, 50-52. The Court generally expects that the witness who was on the stand (or the next witness if the prior witness has been excused) will be in the courtroom when the Court returns from a recess. The Court therefore does not assume that the prosecutor acted with an improper motive. Even if the prosecutor allowed Seifert to enter the courtroom to get an extended view of defendant, Fowler's failure to object was not prejudicial because Seifert did not positively identify defendant.

Defendant also claims that Fowler provided ineffective assistance because he did not ask Seifert if he could positively identify defendant. Id. at 51. Seifert did not positively identify defendant on direct so Fowler reasonably decided not to ask him that question. In addition, the fact that Seifert could not identify defendant was obvious. Fowler had Seifert confirm that he had previously described the perpetrator as "dark complected, fair, dark or Spanish tan" (in contrast to defendant who did not appear to be dark complected). Transcript Of Trial (Doc. #150) at 117. Defendant has not alleged facts which would show that counsel's questioning of Seifert was deficient or prejudicial.

defendant from a window at the halfway house but did not go out to meet him because it was near count time that day (which defendant states is at 2:00 PM). Transcript Of Trial (Doc. #151) at 564-65. Defense counsel cross-examined Wing on the alleged discrepancies and called defendant's sister to rebut Wing's testimony. Defense counsel's strategy to discredit Wing was well within the wide range of reasonable professional assistance. Even if defendant could show that counsel should have more aggressively cross-examined Wing, he has not shown a reasonable probability that but for counsel's failure to do so, the result of the trial would have been different. As noted, evidence of defendant's guilt was "substantial and overwhelming." Memorandum And Order (Doc. #140) at 7; see Strickland, 466 U.S. at 694.

The Court therefore overrules his fifth claim for relief.

## VI.     Failure To Notify Court Of Differences Between Defendant And Counsel (Claim 6)

Defendant argues that counsel provided ineffective assistance because he did not notify the Court when differences arose between him and Fowler. Defendant states that after the Court had erroneously referred to his prior convictions for bank robbery, he disagreed with Fowler's decision not to ask to withdraw a trial stipulation that a firearm functioned as intended by the manufacturer and firearm was manufactured outside the State of Kansas and thus necessarily traveled in interstate and/or foreign commerce. Motion Under 28 U.S.C. § 2255 (Doc. #184) at 47. Decisions concerning trial strategy, such as the filing of motions, only constitute ineffective assistance if they are completely unreasonable, not merely wrong, so that they bear no relationship to a possible defense strategy. See Hatch v. Oklahoma, 58 F.3d 1447, 1459 (10th Cir. 1995). Counsel apparently explained that withdrawing from the stipulation would disrupt the trial schedule and the Court would not grant it. In addition, even if the Court had granted it, defendant has not shown a reasonable probability that the government would have been unable to secure the evidence subject to the

-34-

stipulation. See Trial Exhibit 132. Defendant has not shown that counsel's decision not file a motion to withdraw the stipulation was deficient or prejudicial. The Court overrules defendant's sixth claim for relief.

## VII.   Failure To Object To Discovery Practice (Claim 7)

Defendant argues that counsel was ineffective because he did not object to the U.S. Attorney's discovery practice which precluded him from personally inspecting discovery materials including certain billing statements. Motion Under 28 U.S.C. § 2255 (Doc. #184) at 39-42, 48-49. Defendant has not shown how counsel's performance was deficient. Courts often limit disclosure of sensitive documents to counsel and prohibit criminal defendants from removing or copying such materials.[12] Defendant has not shown that he had a particularized need to personally inspect any discovery materials. In addition, defendant has not shown how counsel's failure to let him personally inspect discovery materials affected the outcome of the trial. Defendant largely complains about potential overbilling by counsel and Stetler, but he has not shown that these billing issues likely affected the outcome of trial. Accordingly, defendant has not established prejudice. The Court overrules defendant's seventh claim for relief.

## VIII.   Failure To Challenge Jury Instruction On Aiding And Abetting A Crime (Claim 8)

Defendant argues that Fowler should have objected to the Court's aiding and abetting instruction because it essentially allowed the government "to have it both ways." Motion Under 28 U.S.C. § 2255 (Doc. #184) at 37. Defendant apparently argues that because Morrison pled guilty

---

[12]     See United States v. Deering, 179 F.3d 592, 596 (8th Cir. 1999) (no abuse of discretion in allowing stand-by counsel but not defendant to inspect government file); United States v. Birbragher, No. 07-cr-1023-LRR, 2008 WL 2246913, at *2 (N.D. Iowa May 29, 2008) (no absolute right to personally inspect or copy documents in government file); see also United States v. Williams, No. S1-00-cr-1008, 2005 WL 664933, at *1 (S.D.N.Y. Mar. 22, 2005) (permitting defendant to personally review sensitive materials only if defense counsel or staff present).

to aiding and abetting the robbery of MidAmerican Bank, the government had to proceed against defendant as the principal, i.e. the one who actually entered the bank.  The record reflects that defense counsel adequately raised this issue.  At trial, the Court overruled counsel's objection because (1) the indictment clearly charged aiding and abetting and (2) defendant's alibi defense injected the issue whether he was at the bank or whether he merely drove the getaway car.  See Transcript Of Trial (Doc. #151) at 571.  Defendant has not shown how counsel's argument on this issue was deficient or prejudicial.  The Court overrules defendant's eighth claim for relief.

**IX.     Failure To Offer Jury Instructions On Lesser Included Offenses (Claim 9)**

Defendant argues that trial and appellate counsel were ineffective for failing to offer jury instructions on the "lesser-included offenses" of accessory after the fact in violation of 18 U.S.C. § 3 or misprision of a felony in violation of 18 U.S.C. § 4.  Motion Under 28 U.S.C. § 2255 (Doc. #184) at 63.  Defendant is entitled to an instruction on lesser-included offenses if the lesser offenses included some but not all of the elements of the offense charged.  United States v. Pearson, 203 F.3d 1243, 1270 (10th Cir. 2000).  The crimes of being an accessory after the fact and misprision of a felony are not lesser included offenses of bank robbery, using a firearm during and in relation to a crime of violence or possession of a firearm by a convicted felon; simply stated, the elements of the offenses under 18 U.S.C. §§ 3 and 4 are not subsets of the elements of the charged offenses.  See Schmuck v. United States, 489 U.S. 705, 715-16 (1989) (lesser-included offense instruction may not be given if lesser offense includes element not part of greater offense).  Accordingly, counsel's failure to seek such instructions was not deficient or prejudicial.  The Court overrules defendant's ninth claim for relief.

**X.     Fowler's General Performance (Claim 10)**

Defendant argues that generally throughout the proceedings, Fowler was ineffective because

he abandoned his duty of loyalty.  Defendant states that counsel breached his duty of loyalty at side bar, in discussing the impact of reading the indictment to the jury, when he stated "believe me I want to get this thing over with, but ..." and saying that he should have caught the error.  Motion Under 28 U.S.C. § 2255 (Doc. #184) at 44; see id. at 28 (at side bar, counsel abandoned defendant and made it clear to government and court that he was not going to offer any resistance at all).  Defendant, however, has taken counsel's comment out of context.  Counsel's comments merely reiterated his goal (as in any case) to try the case only once.  In context, counsel essentially said "I'm sorry to ask for a mistrial before the Court has even started questioning the jury, but I believe that defendant is entitled to one."  Counsel is a well-respected and experienced criminal defense attorney.  The Court has had occasion to see him in action for 23 years and it is absurd to suggest that Fowler would put his professional reputation in jeopardy to try to cover up the Court's mistake at the expense of his client's freedom.  Defense counsel adequately presented the issue and specifically asked the Court to declare a mistrial.  While the Court ultimately overruled the request, defendant has not shown a reasonable probability that if counsel had presented the matter in a different manner, the Court would have a reached a different result.[13]

Defendant claims that Fowler breached his duty of loyalty by billing for services not performed or billing for services at a "fraudulent rate."  Motion Under 28 U.S.C. § 2255 (Doc. #184) at 41; see also id. at 40 (Fowler wanted to bill as many hours as possible).  Defendant's claim that Fowler was using this case primarily for his monetary benefit is completely speculative and inconsistent with his other assertions that Fowler "wanted to get the trial over as soon as possible"

---

[13]    Defendant also claims that counsel lied and breached his duty of loyalty by allowing evidence of prior convictions to be admitted.  Motion Under 28 U.S.C. § 2255 (Doc. #184) at 26-30. For reasons stated above, defendant has not shown that counsel's performance in this regard was deficient or prejudicial.

and did not want a second trial.  Id. at 28.  In sum, defendant has not alleged sufficient facts to show that Fowler overbilled for his services or that Fowler provided ineffective assistance because of any alleged overbilling.

Defendant states that the Court had an "apparent bias" against him.  Traverse To The United States' Response To Hall's Motion Pursuant To 28 U.S.C. § 2255 (Doc. #203-1) at 5.  To the extent defendant claims that counsel was ineffective for failing to ask the undersigned judge to recuse because of bias, the Court overrules defendant's claim.  Under 28 U.S.C. § 455(a), federal judges must disqualify themselves in any proceeding in which their partiality might reasonably be questioned.  Switzer v. Berry, 198 F.3d 1255, 1257 (10th Cir. 2000); see also Code of Conduct For United States Judges, Canon 3, § C(1) ("A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned.").  The test is whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality.  Hinman v. Rogers, 831 F.2d 937, 939 (10th Cir. 1987).  The statutory guidance for recusal must also be read in light of a judge's "duty to sit."  See Nichols v. Alley, 71 F.3d 347, 351 (10th Cir. 1995) (judge has as strong a duty to sit when no legitimate reason to recuse as she does to recuse when law and facts require).  The statute is not intended to give litigants a veto power over sitting judges, or as a vehicle for obtaining a judge of their choice.  United States v. Cooley, 1 F.3d 985, 992-93 (10th Cir. 1993).  Consequently, a judge should not recuse on unsupported, irrational or highly tenuous speculation.  Hinman, 831 F.2d at 939 (citation omitted).

In this case, a reasonable person with access to the relevant facts would not question the impartiality of the undersigned judge.  Under Section 455(b)(l), a judge must disqualify if she has a personal bias or prejudice concerning a party.  The undersigned has no such bias or prejudice against defendant, from extrajudicial sources or otherwise.  See Liteky v. United States, 510 U.S.

540, 554-55 (1994) (bias and prejudice must come from extrajudicial source).

The Court has addressed defendant's numerous allegations against Fowler and find all of them to be without merit.  As noted above, the evidence against defendant was substantial and overwhelming, and the Court has no reason to believe that but for the alleged errors by counsel, either individually or collectively, the result of the trial would have been different.

**XI.      Failure To Raise Amendment 599 To The Sentencing Guidelines (Claim 11)**

Defendant claims that sentencing counsel, Toth, and appellate counsel, Cohen, provided ineffective assistance because they did not argue for application of Amendment 599 to the Sentencing Guidelines.  Defendant asserts that under the reasoning of Amendment 599 to the Sentencing Guidelines, the Court could not sentence defendant for violation of 18 U.S.C. § 2113(d), which carries a 25-year statutory maximum sentence, instead of Section 2113(a), which carries a 20-year statutory maximum sentence.  Motion Under 28 U.S.C. § 2255 (Doc. #184) at 60-62. Defendant essentially argues that the Court enhanced his sentence twice for the same conduct by (1) considering the enhanced penalties under 18 U.S.C. § 2113(d) – for assaulting or putting in jeopardy the life of another by use of a dangerous weapon while committing an offense under 18 U.S.C. § 2113(a) – instead of the limited penalties in 18 U.S.C. § 2113(a), and (2) sentencing defendant to prison under Count 2 for using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1).  Initially, the Court overrules defendant's argument because the Sentencing Guidelines and Amendments do not supplant statutory authority.  Congress clearly expressed its intent that punishment under Section 924(c)(1) be cumulative to the punishment for the underlying violent crime.  United States v. Pearson, 203 F.3d 1243, 1268 (10th Cir. 2000); see United States v. Lanzi, 933 F.2d 824, 826 (10th Cir. 1991) (convictions under §§ 924(c)(1) and 2113(a) and (d) do not violate Double Jeopardy Clause).  Counsel's failure to object at sentencing

or on appeal was not deficient or prejudicial.  The Court overrules defendant's eleventh claim for relief.

### Conclusion

The files and records in this case conclusively show that defendant is not entitled to relief. Moreover, defendant does not allege specific and particularized facts which, if true, would entitle him to relief.  Accordingly, no evidentiary hearing is required.  See 28 U.S.C. § 2255; United States v. Cervini, 379 F.3d 987, 994 (10th Cir. 2004) (standard for evidentiary hearing higher than notice pleading); United States v. Kilpatrick, 124 F.3d 218 (Table), 1997 WL 537866, at *3 (10th Cir. 1997) (conclusory allegations do not warrant hearing); United States v. Marr, 856 F.2d 1471, 1472 (10th Cir. 1988) (no hearing required where court may resolve factual matters raised by Section 2255 petition on record); United States v. Barboa, 777 F.2d 1420, 1422-23 (10th Cir. 1985) (hearing not required unless "petitioner's allegations, if proved, would entitle him to relief" and allegations are not contravened by record).

### Certificate Of Appealability

Under Rule 11 of the Rules Governing Section 2255 Proceedings, the Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right.   28 U.S.C. § 2253(c)(2).[14]   To satisfy this standard, the movant must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Saiz v. Ortiz, 392 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting

---

[14]     The denial of a Section 2255 motion is not appealable unless a circuit justice or a circuit or district judge issues a certificate of appealability.  See Fed. R. App. P. 22(b)(1); 28 U.S.C. § 2253(c)(1).

Tennard v. Dretke, 542 U.S. 274, 282 (2004)).  For reasons stated above, the Court finds that defendant has not satisfied this standard.  The Court therefore denies a certificate of appealability as to its ruling on defendant's Section 2255 motion.

**IT IS THEREFORE ORDERED** that defendant's Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody (Doc. #184) filed February 16, 2012 be and hereby is **OVERRULED**.  A certificate of appealability as to the ruling on defendant's Section 2255 motion is **DENIED**.

Dated this 10th day of March, 2015 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge